88 So.2d 10

**W. H. HODGES AND COMPANY, Inc.**

v.

**John M. AARON and Woodrow W. Wester.**

No. 42470.

May 7, 1956.

---

Jones T. Prowell, Jackson P. McNeely, New Orleans, for plaintiff-appellant.

Gahagan & Gahagan, by Russell E. Gahagan, Natchitoches, for defendants-appellees.

FOURNET, Chief Justice.

The plaintiff, W. H. Hodges & Co., Inc., alleging it is the holder in due course for value of a note in the amount of $24,550 executed February 29, 1952, by the defendants, John M. Aaron and Woodrow W. Wester, in favor of W. H. Hodges & Company—which note represents the purchase price of certain cattle and is paraphed for identification with a chattel mortgage covering these cattle as well as 20 head of

"stocker" (common) cattle, given as additional security—seeks judgment against the defendants in solido for the amount of the note due in principal, interest, and attorney fees, and to have its lien, privilege, and chattel mortgage recognized and enforced under a writ of sequestration.[1]

The defendants excepted to the petition on the ground it disclosed neither a cause nor a right of action, and, answering, denied the plaintiffs held the note for value. Further averring the consideration thereof had failed in that the note had been given in payment for cattle represented to them "as being good quality young brood cows," when an inspection revealed the cattle were not fit or suited for the purpose for which they were purchased, the defendants, in reconvention, sought to have the sale annulled and avoided, the note returned to them, and the plaintiff decreed to be the owner of the cattle, which they tendered.

After a full and exhaustive trial on the merits there was judgment in favor of the defendants as prayed, and the plaintiff is appealing from that judgment.

It appears that W. H. Hodges & Company,[2] dealer in cattle with an auction barn and office in Alexandria, Louisiana, had the

---

1. The cattle were seized under the writ of sequestration, and, at the suggestion and request of attorney for plaintiff, placed in the custody of the defendant Aaron.
2. W. H. Hodges & Company of Alexandria is a partnership composed of the surviving widow and children (three sons and a daughter) who own their interests therein as the heirs of the late W. H. Hodges, formerly doing business as the Hodges Company of Alexandria, and this partnership, together with the surviving widow and three sons, are the sole owners of all of the stock in W. H. Hodges & Company, Inc., of New Orleans, Louisiana.

cattle in controversy [3] in a pasture at Boyce, near Alexandria, and was seeking some one interested in their purchase. A representative of the company, Roderick Champion, in whose hands the sale had been placed, knowing of the desire of the defendants to go into the business of raising cattle, approached them with the view of selling the herd, and, upon his representation that the cattle were young brood cows of good quality, the defendants agreed to their purchase on credit, giving therefor the note and chattel mortgage involved in this suit. The cattle were promptly moved from the pasture in Boyce to one leased by the defendants not far from Natchitoches, and, from time, as the calves were sold, the proceeds derived from this source were applied toward the principal and interest on the note.[4]

Several months later the defendants received information that the cattle were old and not as represented, whereupon they constructed pens and chutes in their pasture so that the cattle might be corralled and inspected. This inspection revealed many of the cows in the herd were old and the Hodges office in Alexandria was immediately contacted. No satisfaction having been received from this course, some three weeks later the defendants took the matter up direct with the New Orleans office by letter dated August 10, 1952, as the result of which a representative was sent from the Alexandria office to the pasture, but delayed making the inspection upon arrival there because of the heat. Nevertheless, the note was renewed on August 29, 1952,[5] its due date, upon the assurance of representatives of the plaintiff an inspection would be made of the cattle and the matter adjusted to their satisfaction. This inspection was not made until March 23, 1953, and upon the refusal of the company to make any other adjustment than to replace the number of cattle that had died during the interim (between 10 and 12, all of which were "gummers"),[6]

3. It appears these cattle were purchased from Ralph Ingram, who had secured them from Texas sight unseen and had kept them for several months in his pasture at Boyce before selling them to the Hodges company in the early part of February of 1952, after the cattle had been inspected by the company and some three or four bad or old cows culled from the herd, which herd, at the time of the purchase by the defendants, consisted of 69 white-faced Hereford cows, 1 registered bull, and 40 or 41 calves.

4. The defendants paid on the principal $3,603.93, and in interest between February 29, 1952, and February 28, 1953, interest in the sum of $1,339.03.

5. The notation on the reverse of the note reads: "August 29, 1952: Interest on the within note has been paid through August 29, 1952 and the principal balance of $23,644.93 is hereby extended to February 28, 1953, with interest at the rate of 6% per annum from August 29, 1952, until paid, without notation."

6. It appears that in the case of dehorned cows, such as these were, the only way in which the age of the cow can be determined is by penning them and breaking their mouths open for a close inspection of their teeth. Those without any teeth, called "gummers," are considered to be very old; those with short teeth, called "short-mouth" cows, are also considered up in age, since the wearing away of the teeth is a more or less gradual process and the teeth become worn

although the March inspection revealed that of the 58 cows remaining in the herd there were 8 "gummers," 15 with bad teeth, and 16 with medium teeth, leaving only 19 cows that could be properly classified as young brood cows, the defendants placed the matter in the hands of an attorney who, by letter, notified the plaintiff the sale was considered as rescinded and requested that the cattle be picked up and the note returned. This suit on the note and mortgage followed.

Despite the report of the plaintiff's agent McCampbell following his inspection of the cattle on March 23, 1953, it is the contention of the plaintiff that the cows sold to the defendants were young; further, that they were not even represented to the defendants as young. The argument is that the reason there were so many "gummers," "short-mouth" and "broken-mouth" cows in the herd was due to the fact that their teeth had been worn down over the period from their purchase in February of 1952 to the inspection made by the defendants in July of 1952, and the inspection made by the plaintiff in March of 1953, by grazing on short grass in a sandy pasture. It is further argued that their poor condition and the death of the cows during the winter months was due to an insufficiency of grazing material on a

pasture too small to accommodate the number of cattle, and the further fact that they were not properly fed or cared for.

■ Not only do we find the cattle were represented to the defendants as young brood cows, but that the defendants purchased them in reliance on this representation and would not have bought them otherwise. We think the record is equally clear, as reflected by the inspection made by the planitiff's representative on March 23, 1953, that the cows were, for the most part, old and unsuitable for breeding purposes. We are fortified in this conclusion for the record reveals that, during the pendency of the suit, the cattle were sold by the plaintiff, not for brood purposes, but for slaughter.[7]

A casual reading of the record readily discloses there is no basis for the claim that the condition of the teeth was attributable to the fact the cattle had grazed on land consisting of short grass and composed largely of sandy loam and gritty material. In fact, there is no evidence that the greater part of the pasture was sandy loam and gritty material. The record further reveals there is no basis for the contention that the cattle were not properly cared for. There is an abundance of evidence disclosing the cattle were not only well fed and given

through the years. Gummers, cows with short teeth, and cows with broken teeth cannot, of course, properly masticate their food, and, for this reason, become weak and thin and die unless given special care and are fed on especially prepared soft food.

7. The record does not disclose on what authority the cattle, under seizure and in the custody of Aaron, were removed and sold; nor does it show the amount realized from such sale and the disposition of these funds.

every attention, even to the extent that special food and drugs were secured in an effort to stimulate their appetite and strengthen them, but also that the pasture was ample for the cattle thereon, was composed of good grazing material, including clover, and that the defendants employed special caretakers and also the services of a veterinarian in an attempt to save the herd.

■ Counsel is further in error in the contention that the defendants in their reconventional demand seek to rescind the sale under the provisions of Articles 2521–2530 of the LSA–Civil Code for apparent or latent defects and redhibitory vices, for the pleadings and the evidence reveal the entire defense is predicated upon failure of consideration in that the note sued on was given in payment for cattle represented to be young brood cows when, in fact and in truth, they were old and unsuited for that purpose.

■ Nor did the defendants waive any rights they may have had with respect to the avoidance of the sale by the renewal of the note on August 29, 1952, for the note was, as reflected by the evidence, only renewed after they had been assured by the representatives of the plaintiff a satisfactory adjustment would be made as soon as it

could be determined by an inspection just how many cattle should be replaced.

■■ The final contention of plaintiff's counsel is equally without merit. They not only fail to point out in what manner the defendants might have minimized their damages, but it is apparent that under the particular facts of this case they were powerless to do so. They could not dispose of the cattle because of the recorded chattel mortgage covering them, and they were without funds with which to purchase young brood cattle on the open market for the purpose of replacing them. The same may be said with respect to the claim of the ineffectiveness of the tender of the cattle, both in the letter of defendants' counsel of June 12, 1953, at the time the answer was filed, and also at the time the case was tried, for the plaintiff admits the calves were all sold under the supervision of and upon the advice and with the consent of the plaintiff and the receipts turned over to the plaintiff to be applied toward the principal and interest of the note, and we know of no law that would have required the defendants to tender to the plaintiff the dead cows, especially when the record shows they died through no fault of the defendants.

For the reasons assigned, the judgment appealed from is affirmed, at the cost of the plaintiff.